Filed 7/13/22  P. v. Gutierrez CA2/3
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSE JUAN GUTIERREZ et al.,<br><br>    Defendants and Appellants. | B250333<br><br>(Los Angeles County<br>Super. Ct. No. BA388274) |

APPEALS from judgments of the Superior Court of Los Angeles County, Monica Bachner, Judge.  Affirmed in part, reversed and remanded in part with directions.

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant Gerardo Jacobo.

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant Jose Juan Gutierrez.

Rob Bonta, Attorney General, Lance E. Winters, Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney

General, Noah P. Hill and Nima Razfar, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

In 2013, Jose Juan Gutierrez and Gerardo Jacobo were convicted of, among other crimes, premeditated attempted murder with gang and firearm use enhancements. They appealed their convictions, raising numerous claims, all of which this Division rejected. As we explain in greater detail below, since then, Gutierrez and Jacobo have been pursuing, successfully in large part, their appellate remedies. Here is where we are in that pursuit: the California Supreme Court has vacated a prior opinion we issued in 2019 and directed us to reconsider the cause in light of recently-enacted Senate Bill No. 775 (2021–2022 Reg. Sess.) (Senate Bill 775). In accordance with that order, we have reconsidered the matter in light of Senate Bill 775, as well as Assembly Bill No. 333.[1] We find both statutes applicable, and, accordingly, remand the matter for a potential retrial on the attempted murder count (Jacobo only) and the gang allegations (Jacobo and Gutierrez) and for resentencing.

———————————

[1] While the matter has been pending on appeal, the legislature also passed Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333). We consider the impact of that new law as well.

2

# BACKGROUND

I.      Evidence from the 2013 trial[2]

     A. *The shooting*

Gutierrez and Jacobo were members of the City Terrace gang, whose main rival was the Geraghty Lomas gang.  On August 7, 2011, at about 1:30 a.m., Martha G. drove her van to Duke's liquor store.  Martha's passengers included her husband Joel, her stepson Santiago, and Santiago's friend, Ernie.  The liquor store was within territory claimed by the Geraghty Lomas gang.  Ernie and Santiago went into the store to buy beer while Martha and Joel waited in the van.  Santiago was walking with a crutch.

Just after Ernie and Santiago entered the liquor store, a pickup truck parked at the front entrance.  Jacobo got out of the truck and went into the liquor store, where he appeared to exchange words with either Ernie or Santiago, or both of them.[3] Jacobo made his purchase and left the store.  Immediately afterward, Santiago and Ernie completed their purchase and left the store.  As they were walking out the front entrance, Jacobo was sitting in the truck's front passenger seat and was in the act of pulling the truck door closed.  Santiago gestured toward Jacobo

---

[2]      Our summary of the facts underlying the crimes is largely as stated in our vacated 2016 and 2019 opinions.

[3]      Much of the evidence at trial came from video surveillance cameras that were mounted in and around the liquor store.  The jury was shown a series of video clips of what occurred inside and outside the store during the incident.  We have viewed the video clips, which do not have sound.

and appeared to say something to him. In response, Jacobo and Gutierrez (who was sitting in the rear passenger seat) immediately got out of the truck.

Initially, Jacobo and Gutierrez both approached Santiago, who was standing just a few steps away. Jacobo punched Santiago in the face and grabbed his crutch. Santiago began running down the sidewalk in the direction of Martha's van. Meanwhile, Gutierrez turned and approached Ernie, who had been standing slightly behind Santiago. Gutierrez swung at Ernie's head with a handgun and kicked him. Ernie fell to the ground. Gutierrez kicked Ernie again and then joined Jacobo in chasing Santiago down the sidewalk. With Gutierrez running right behind him, Jacobo chased Santiago while swinging the crutch at him. As the three men were running down the sidewalk, Joel got out of Martha's van and joined the fray in an effort to protect Santiago. The melee spilled over into an intersection. Joel and Gutierrez apparently began to fight and then Gutierrez fired his gun six times at Joel, hitting him twice.[4] Joel ran back to the van, which sped off. Jacobo and Gutierrez returned to the pickup truck and the driver sped off.

---

[4] On the videotape, Martha's van is partially obscured from view by some fencing and Joel cannot be seen getting out of the van. However, a fourth figure suddenly comes into view in the intersection. The gunshots cannot be seen on the videotape. Because Ernie remained close to the liquor store entrance after being attacked by Gutierrez, it is apparent that Joel must be the fourth figure on the videotape. Joel was subsequently deported to Mexico and he did not testify at trial. Neither Santiago nor Ernie testified at trial.

4

Martha testified that she was sitting in the van talking to Joel when the fight broke out. She watched Santiago and Ernie leave the liquor store, and she saw the defendants attack them. When Joel got out of the van to help Santiago, he began fighting with Gutierrez. Martha saw Gutierrez shoot at Joel five or six times. Joel ran back to the van and said he had been shot. Martha drove off, leaving Ernie behind. She drove Joel to the hospital where he was treated for gunshot wounds to his leg and hip. According to Martha, neither Joel, Santiago nor Ernie were armed that night.

Alfonso E. was working at Duke's liquor store that night and he recognized Ernie as a regular customer. Alfonso saw Jacobo walk in, approach Ernie and exchange words with him. Jacobo said, "Where are you [from]? This is City Terrace." Alfonso testified that Ernie replied by saying, "That's cool. No problem." However, when Alfonso was interviewed by the police, he told them that Ernie had responded: "This is Geraghty." Moments after Ernie and Santiago left the store, Alfonso heard gunfire.

The police found six expended .380-caliber shell casings in the street, five or six car lengths from Duke's liquor store.

B. *The gang evidence*

Detective Eduardo Aguirre testified as the prosecution's gang expert. He was familiar with the City Terrace gang, whose primary activities included murders, shootings, robberies, drug sales, possession of handguns, burglaries, vandalism, and stealing cars. Duke's liquor store is located at the north end of territory belonging to the Geraghty Lomas gang, about a quarter mile from the border with City Terrace territory. Geraghty

5

Lomas is City Terrace's main rival. Their contiguous border was a source of tension between the two gangs.

Aguirre testified it would constitute a sign of disrespect for a gang member to venture into a rival gang's territory. When a gang member "hits up" a potential rival by inquiring where he is from, this is a confrontational challenge (the speaker is asking the other person to reveal his gang affiliation) that is considered a provocation and can lead to a physical assault or a shooting if the person answers with the name of a rival gang. It is an accepted part of gang culture that a gang member must take some form of action when confronted by a rival. Backing down from a potential confrontation is frowned upon, and a gang member who did so would not only lose respect, but could possibly be ejected from the gang, assaulted, or killed. Aguirre explained that "if a gang member is disrespected out in the street, what you're supposed to do, you're supposed to act on it with some sort of violence."

Aguirre testified that gang members pass guns around among themselves and store them in safe places having no known ties to the gang. It is common for gang members to stay armed even when they are just out socializing with friends. Gang members make it a point to know whether fellow members of their gang are armed; this is "for their own protection, and in order to go and commit crimes."

Aguirre testified that both defendants were members of the City Terrace gang. Jacobo, who was 31 or 32 years old, had been a member since he was 15. Jacobo had personally admitted his membership to Aguirre. Gutierrez, who was younger, had been a member of the City Terrace gang for only four or five years. It

6

was stipulated that Gutierrez was a member of City Terrace on the night Joel was shot.

Asked a hypothetical question based on the evidence in this case, Aguirre opined that the shooting had been committed for the benefit of the City Terrace gang. Following the hostile encounter inside the liquor store, Jacobo was just getting back into the truck when Santiago walked by and apparently said something provocative: "That showed an outright disrespect to the older gang member [i.e., Jacobo], as well as to the younger gang member [i.e., Gutierrez] in the car. And at that point, both City Terrace gang members had no choice but to act and either assault, shoot or kill the persons that disrespected them."

C. *Verdicts and sentences*

In 2013, a jury found Gutierrez guilty of willful, deliberate, and premeditated attempted murder with true findings on gang and gun allegations (Pen. Code,[5] §§ 664, 187, subd. (a), 186.22, subd. (b)(1)(C), 12022.53, subds. (b), (c), (d); count 1); assault with a deadly weapon, a crutch, on Santiago with true findings on a gang allegation (§ 245, subd. (a)(1), 186.22, subd. (b)(1)(B); count 2); and assault with a semiautomatic firearm on Ernie with true findings on gang and gun allegations (§§ 245, subd. (b), 186.22, subd. (b)(1)(B), 12022.5, subd. (a); count 3).

The jury found Jacobo guilty of willful, deliberate and premeditated attempted murder with true findings on gang and principal gun use allegations (§§ 664, 187, subd. (a), 186.22, subd. (b)(1)(C), 12022.53, subds. (b), (c), (d) & (e)(1); count 1);

---

[5]     All further statutory references are to the Penal Code unless otherwise indicated.

7

assault with a deadly weapon, a crutch, on Santiago with true findings on a gang allegation (§ 245, subd. (a)(1), 186.22, subd. (b)(1)(B); count 2); and misdemeanor simple assault on Ernie (§ 241, subd. (a); count 3).

The trial court sentenced Gutierrez to a determinate term of 17 years 8 months and to a life term with a 15-year minimum parole eligibility for the attempted premeditated murder plus a consecutive 25-years-to-life term for the firearm enhancement. It sentenced Jacobo to a determinate term of eight years, plus a life term for the attempted premeditated murder, plus a 25-years-to-life term. As to both defendants, the trial court imposed restitution fines, suspended parole revocation restitution fines, court operations assessments, and criminal conviction assessments.

II.     Procedural background

Gutierrez and Jacobo appealed their 2013 convictions. Jacobo contended that the trial court abused its discretion in admitting gang expert testimony, there was insufficient evidence that he premeditated or committed attempted murder, the jury was misinstructed on attempted premeditated murder and on the natural and probable consequences doctrine, and the jury should have been instructed on voluntary manslaughter and on voluntary intoxication. For his part, Gutierrez asked us to review sealed transcripts of two in camera hearings concerning the identity of gang members and confidential informants, and he contended there was insufficient evidence to support his assault with a deadly weapon conviction and the trial court should have instructed on attempted voluntary manslaughter. We rejected all contentions and affirmed the judgments of conviction in a

nonpublished opinion.  (*People v. Gutierrez* (Mar. 3, 2016, B250333).)

Both defendants petitioned for review, and, in 2016, the California Supreme Court granted Jacobo's petition and deferred further action pending its decision in *People v. Mateo* (rev. granted May 11, 2016, S232674).  While review was pending, the Legislature enacted Senate Bill Nos. 620, which gave trial courts discretion to strike firearm enhancements, and 1437, which changed the law regarding felony murder and the natural and probable consequences doctrine.

In 2019, the Supreme Court transferred the matter to us with directions to vacate our earlier decision and reconsider the cause in light of Senate Bill No. 1437.  We accordingly vacated our 2016 opinion and issued a new one, again affirming the judgments of conviction but vacating Jacobo's and Gutierrez's sentences and remanding for resentencing under Senate Bill No. 620.  (*People v. Gutierrez* (Oct. 31, 2019, B250333) [nonpub. opn.].)

Jacobo petitioned for review, and the California Supreme granted the petition, deferring action pending its decision in *People v. Lopez* (S258175).  In December 2021, the court transferred the matter to us with the direction to vacate our decision and reconsider it in light of Senate Bill 775.[6]  In addition to reconsidering the matter in light of that new law, we also consider Assembly Bill 333, which became effective while this matter has been pending.

---

[6]    The parties submitted supplemental briefing, with Gutierrez electing to join Issue III regarding Assembly Bill 333 in Jacobo's supplemental brief.

## DISCUSSION

I.   Senate Bill 775 and Jacobo's premeditated attempted murder conviction

Jacobo[7] contends that under Senate Bill 775 instruction on the natural and probable consequences doctrine on count 1 for attempted murder was error and requires reversal of that count. We agree.

### A. *Senate Bill Nos. 1437 and 775*

Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) limited accomplice liability under the felony-murder rule and eliminated the natural and probable consequences doctrine as it relates to murder. (*People v. Lewis* (2021) 11 Cal.5th 952, 957, 959; *People v. Gentile* (2020) 10 Cal.5th 830, 842–843 (*Gentile*).) To achieve these goals, Senate Bill 1437 added section 189, subdivision (e) (limiting application of the felony-murder rule) and section 188, subdivision (a)(3) (stating that "[m]alice shall not be imputed to a person based solely on his or her participation in a crime"). As amended, section 188 "bars a conviction for first or second degree murder under a natural and probable consequences theory." (*Gentile*, at p. 846.) Senate Bill 1437 also added former section 1170.95 (now § 1172.6),[8] which created a procedure whereby persons convicted of murder under a now-invalid felony-murder or natural and probable consequences

---

[7]   Gutierrez, who was the shooter, does not join this argument.

[8]   Effective June 30, 2022, section 1170.95 was renumbered to section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.)

10

theory may petition for vacation of their convictions and resentencing.

Senate Bill 775 changed Senate Bill 1437 in several respects. Two are relevant here. First, Senate Bill 775 added subdivision (g) to section 1172.6. That subdivision provides, "A person convicted of murder, attempted murder, or manslaughter whose conviction is not final may challenge on direct appeal the validity of that conviction based on the changes made to Sections 188 and 189 by Senate Bill 1437." (§ 1172.6, subd. (g).) Subdivision (g) supersedes *Gentile*'s holding that Senate Bill 1437's ameliorative provisions do not apply on direct appeal (see *Gentile*, *supra*, 10 Cal.5th at p. 839), and allows Jacobo to challenge the validity of his conviction under the amended law in this appeal. (See *People v. Hola* (2022) 77 Cal.App.5th 362, 369–370; *People v. Glukhoy* (2022) 77 Cal.App.5th 576, 584.)

Second, Senate Bill 775 expanded Senate Bill 1437 to reach attempted murder. As originally enacted, section 1172.6's express language encompassed only murder, not attempted murder or manslaughter. Accordingly, prior to the enactment of Senate Bill 775, California appellate courts had concluded that section 1172.6 did not extend to convictions for those offenses. (See, e.g., *People v. Flores* (2020) 44 Cal.App.5th 985, 993–994.) Senate Bill 775 amended section 1172.6 to expressly encompass attempted murder and manslaughter. (§ 1172.6, subd. (a); see also subd. (d)(1); *People v. Porter* (2022) 73 Cal.App.5th 644, 651–652; *People v. Coley* (2022) 77 Cal.App.5th 539, 544.) Thus, Senate Bill 775 eliminates the natural and probable consequences doctrine as a basis to prove an accomplice committed attempted murder. (*People v. Sanchez* (2022) 75 Cal.App.5th 191, 196.)

There is no dispute that Jacobo's appeal was not final when Senate Bill 775 took effect, and therefore the amendments apply retroactively to him. (See, e.g., *People v. Montes* (2021) 71 Cal.App.5th 1001, 1006–1007; *People v. Porter*, *supra*, 73 Cal.App.5th at p. 652.)

B. *Harmless error*

Jacobo's jury was instructed on the natural and probable consequences doctrine, with assault with a deadly weapon or simple assault as the target offense or offenses and premeditated attempted murder the nontarget offense, per CALCRIM No. 402. The jury was also instructed on aiding and abetting with CALCRIM No. 401. But, as our discussion of Senate Bills 1437 and 775 above makes clear, instruction on the natural and probable consequences doctrine was improper under the amended law. We therefore turn to the question of prejudice.

"When a trial court instructs the jury on alternative theories of guilt and at least one of those theories is legally erroneous at the time it was given, we normally assess whether the error was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24." (*Gentile*, *supra*, 10 Cal.5th at p. 851; *People v. Aledamat* (2019) 8 Cal.5th 1, 3 (*Aledamat*).) We "must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, [we] determine[ ] the error was harmless beyond a reasonable doubt." (*Aledamat*, at p. 3.)

In *Aledamat*, our Supreme Court "rejected a more demanding standard of review . . . that would have required the court to examine the verdict and the record and to find evidence in the record to support a determination, beyond a reasonable

12

doubt, that the jury actually relied on the valid, not the invalid, theory." (*People v. Thompkins* (2020) 50 Cal.App.5th 365, 399; see *People v. Glukhoy*, *supra*, 77 Cal.App.5th at pp. 592–593; *People v. Stringer* (2019) 41 Cal.App.5th 974, 984.) *Aledamat*, *supra*, 8 Cal.5th at page 9, concluded, "no higher standard of review applies to alternative-theory error than applies to other misdescriptions of the elements. The same beyond a reasonable doubt standard applies to all such misdescriptions, including alternative-theory error." "It is enough if we can say, beyond a reasonable doubt, the legally inadequate theory did not contribute to the verdict." (*Thompkins*, at p. 399.)

*Aledamat* suggested various nonexclusive methods of evaluating prejudice. "An examination of the actual verdict may be sufficient to demonstrate harmlessness, but it is not necessary." (*Aledamat*, *supra*, 8 Cal.5th at p. 13.) The reviewing court may examine "what the jury necessarily did find" and consider "whether it would be impossible, on the evidence, for the jury to find *that* without *also* finding the missing fact as well." (*Id.* at p. 15, citing *California v. Roy* (1996) 519 U.S. 2, 7 (conc. opn. of Scalia, J.).) Circumstances that may factor into the prejudice calculus include the parties' arguments, questions posed by the jury, and the instructions as a whole. (*Aledamat*, at pp. 12, 13–14; *People v. Baratang* (2020) 56 Cal.App.5th 252, 263.) Alternative-theory error is also harmless where, "based on evidence that is overwhelming and uncontroverted," the reviewing court is "convinced on appeal, beyond a reasonable doubt, that ' "the jury verdict would have been the same absent the error." ' " (*People v. Thompkins*, *supra*, 50 Cal.App.5th at p. 401, citing *People v. Merritt* (2017) 2 Cal.5th 819, 832.)

13

Under *Aledamat*, we cannot find the error harmless. To prove Jacobo guilty of attempted murder, the People had to prove he had the intent to kill Joel.[9] (See generally *People v. Perez* (2010) 50 Cal.4th 222, 229; *People v. Nguyen* (2015) 61 Cal.4th 1015, 1054 (*Nguyen*).)

Beginning with the verdicts, considered in light of the instructions, they do not establish that the jury determined Jacobo had an intent to kill. Gutierrez was prosecuted and convicted as the shooter, while Jacobo was convicted of only principal gun use allegations (§ 12022.53, subds. (b), (c), (d) & (e)(1)). While the jury did find the premeditation allegation true as to Jacobo, that true finding did not establish his intent to kill. Rather, the jury was instructed that "the attempted murder was done willfully and with deliberation and premeditation *if either the defendant or Jose Gutierrez or both of them acted with that state of mind*." (Italics added.) The jury was therefore not instructed that Jacobo *personally* had to act willfully (defined as intending to kill when he acted) and with deliberation and premeditation. Instead, they were told they could attribute deliberation and premeditation to Jacobo if either he or Gutierrez acted with that state of mind. We therefore cannot find that the verdicts and instructions reflect a finding about Jacobo's intent to kill.

---

[9] There is some dispute about how the error analysis is to be applied under *Aledamat*. (See generally *People v. Glukhoy*, *supra*, 77 Cal.App.5th at pp. 592–593.) We need not weigh in on the dispute, because the error requires reversal employing any standard of determining harmless error beyond a reasonable doubt.

14

Turning to argument, the prosecutor in closing discussed both aiding and abetting and the now-invalid natural and probable consequences doctrine. As to the latter theory, he said "we don't look at what was defendant Jacobo actually thinking." Rather, even if jurors were unconvinced that Jacobo aided and abetted Gutierrez, they could still find Jacobo guilty because the attempted murder was the natural and probable consequence of his own criminal conduct. That is, Jacobo committed the assaults and, as a gang member, would have reasonably known a murder would result. The prosecutor further asked whether anyone would be surprised if a gang member started a fight and somebody pulled out a gun and shot somebody? He answered his own question, "Of course not." He argued that the natural and probable consequences doctrine was crafted specifically to ask what a reasonable person would expect, so a person would not be able to argue, "It wasn't me. I didn't shoot." He continued, "Guess what. You're a gang member. Your buddy was a gang member. You created a situation in which he had to protect you. You don't get to turn around and use that as a [cop out]." The prosecutor summed up in rebuttal that even if the jury didn't buy that Jacobo fully knew what was going on, the case boiled down to the simple question whether a reasonable person would expect this type of result. He thus asked, "Is anybody here surprised that this situation played out as it did? No, clearly not. Because this type of situation bears itself out repeatedly over and over again. And that's exactly why defendant Jacobo is also guilty."

Although the prosecutor also argued that the jury could find Jacobo guilty under a direct aiding and abetting theory, the prosecutor at least equally emphasized that the jury could find Jacobo guilty under the natural and probable consequences

doctrine, as our summation shows.  That being so, the prosecutor's argument further suggests the error was prejudicial. (See, e.g., *People v. Sanchez*, *supra*, 75 Cal.App.5th at p. 197 [prosecutor argued both theories to jury]; *People v. Baratang*, *supra*, 56 Cal.App.5th at p. 264 [prejudicial error found where prosecutor argued legally invalid theory at length]; *People v. Powell* (2021) 63 Cal.App.5th 689, 715 [prosecutor's argument is relevant to determine whether error harmless]; *In re Rayford* (2020) 50 Cal.App.5th 754, 783.)

Nor can we say that the evidence was so overwhelming and uncontroverted to convince us beyond a reasonable doubt that the verdict would have been the same absent the error.  On the evidence presented, the jury could have found that Jacobo's focus during these events was on Santiago, who Jacobo beat with a crutch and chased.  While the evidence suggests that Jacobo and Gutierrez were in sync about fighting Santiago and Santiago's companions, and Jacobo might have known about the gun— especially once Gutierrez used it to beat Ernie—we cannot characterize the evidence as being overwhelming that Jacobo shared Gutierrez's intent to shoot and kill Joel.  Therefore, we cannot say that instructing the jury on the natural and probable consequences doctrine was harmless beyond a reasonable doubt.

Nonetheless, we cannot agree with Jacobo's further argument that remand for potential retrial is barred because there was insufficient evidence he aided and abetted the attempted murder.[10]  A person aids and abets a crime when the

_____

[10]     Jacobo raised sufficiency of the evidence in his first appeal from the judgment of conviction and the matter was resolved on appeal solely on the basis that there was sufficient evidence to

16

person, acting with (1) knowledge of the perpetrator's unlawful purpose; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the crime. (*Nguyen*, *supra*, 61 Cal.4th at p. 1054.) To be guilty of aiding and abetting an attempted murder, a person must give aid or encouragement, knowing that the direct perpetrator intends to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing. (*People v. Lee* (2003) 31 Cal.4th 613, 624.) Factors relevant to aiding and abetting include presence at the scene of the crime, companionship, and conduct before and after the offense. (*Nguyen*, at p. 1055.)

Here, Jacobo and Gutierrez were together throughout the events, including fleeing together. The evidence could support a finding that Jacobo instigated the events by issuing a gang challenge to Santiago while in the store, even though Santiago apparently said something to Jacobo outside the store. Clearly angered by whatever Santiago said, Jacobo and Gutierrez got out of the truck together, which could suggest a shared intent. Further, Gutierrez got out of that truck with the gun. Jacobo then took Santiago's crutch, hit him with it, and pursued Santiago when he tried to escape. In keeping with Jacobo's conduct, Gutierrez beat Ernie with a gun,[11] helped Jacobo pursue Santiago, and then shot Joel when he tried to help Ernie and

support the conviction under the natural and probable consequences doctrine.

[11] A photograph still shows Gutierrez with what appears to be the gun in his right hand and Jacobo is standing next to him, albeit with his back to Gutierrez.

17

Santiago. Based on these arguably coordinated actions, a jury could find that Jacobo knew that Gutierrez had a gun and shared Gutierrez's intent to harm Santiago and anyone who tried to help Santiago or to interfere, including an intent to kill Joel.

And although gang evidence alone cannot prove that a defendant aided and abetted a crime, a gang expert's testimony can strengthen the inferences to be drawn from other evidence specific to the defendant's role in the crime. (*Nguyen, supra*, 61 Cal.4th at p. 1055.) Here, Gutierrez and Jacobo were members of the same gang and were in rival territory. They had driven to the liquor store together, and Gutierrez had a gun. Alfonso testified that when Jacobo was in the store, Jacobo asked Santiago or Ernie where he was from, which the gang expert said could be perceived as a confrontational gang challenge. When Santiago apparently responded provocatively outside the store, Jacobo and Gutierrez had—as the gang expert explained—no choice but to respond violently by assaulting, shooting, or killing any person that disrespected them.

Given this evidence and the reasonable inferences that can be drawn from it, remand is appropriate to give the People the option to retry count 1 as to Jacobo.

II.     Assembly Bill 333 and the gang enhancements

Jacobo and Gutierrez argue that recent amendments to section 186.22, the gang enhancement statute, require reversal of the gang enhancements. The People concede, and we agree.

"Section 186.22 provides for enhanced punishment when a defendant is convicted of an enumerated felony committed 'for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members.' " (*People v. Delgado*

18

(2022) 74 Cal.App.5th 1067, 1085; *People v. Lopez* (2021) 73 Cal.App.5th 327, 344; § 186.22, subd. (b)(1).)  One element necessary to prove a section 186.22, subdivision (b)(1) gang enhancement is that the group alleged to be a gang has engaged in a "pattern of criminal gang activity."  (§ 186.22, subd. (f).)  When the instant matter was tried, "pattern of criminal gang activity" was defined as the " 'commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more [enumerated] offenses, provided at least one of these offenses occurred after the effective date of [the enacting legislation] and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons . . . .' "  (*People v. Valencia* (2021) 11 Cal.5th 818, 829; former § 186.22, subd. (e).)  These prior offenses have come to be known as "predicate offenses."  (*Valencia*, at p. 826.)

Assembly Bill 333, which took effect on January 1, 2022, made significant amendments to section 186.22.  The legislation redefined "pattern of criminal gang activity" in five respects, as follows.  (1)  Previously, the predicate offenses had to have been committed, or convictions had to have occurred, within three years of each other.  Now, additionally, the last offense must have occurred within three years of the date the current offense is alleged to have been committed.  (§ 186.22, subd. (e)(1).)  (2)  The amended law expressly states that the predicate crimes must have been committed by "members," not simply "persons," as formerly stated.  (*Ibid.*)  In contrast to the former law, the predicates must have been gang-related.  (*People v. Rodriguez* (2022) 75 Cal.App.5th 816, 822–823.)  (3)  The amendments impose a new requirement that the predicate offenses "commonly

19

benefited a criminal street gang, and the common benefit of the offense is more than reputational." (§ 186.22, subd. (e)(1); *Rodriguez*, at pp. 822–823.) (4) Looting, felony vandalism, felony theft of an access card or account, and other identity fraud crimes no longer qualify as predicates, while other offenses (kidnapping, mayhem, torture, and felony extortion) now do so qualify. (§ 186.22, subd. (e)(1).) (5) The currently charged offense may not be used to establish the pattern of criminal gang activity. (*Id.* at subd. (e)(2).)

Assembly Bill 333 also modified the definition of "criminal street gang." Previously, section 186.22 stated that a criminal street gang was "any ongoing organization, association, or group" of three or more persons, whether formal or informal. That language has been changed to "an *ongoing, organized association* or group of three or more persons, whether formal or informal." (§ 186.22, subd. (f), italics added; see *People v. Delgado*, *supra*, 74 Cal.App.5th at p. 1086; *People v. Lopez*, *supra*, 73 Cal.App.5th at p. 344.) The previous definition required that the gang's "members *individually* or collectively engage in, or have engaged in," the pattern of criminal gang activity. (Former § 186.22, subd. (f), italics added). Now, the word "individually" has been excised and the gang's members must "collectively" engage in, or have engaged in, the pattern of criminal gang activity. (§ 186.22, subd. (f).) The amendment also added a new subdivision clarifying that benefit to the gang must be more than reputational; for example, "financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or

intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).)[12]

Assembly Bill 333's amendments to section 186.22 apply retroactively to this case. (See, e.g., *People v. Rodriguez, supra*, 75 Cal.App.5th at p. 819; *People v. E.H.* (2022) 75 Cal.App.5th 467, 478; *People v. Delgado, supra*, 74 Cal.App.5th at p. 1087; *People v. Lopez, supra*, 73 Cal.App.5th at pp. 343–344.) Here, the prosecution provided evidence of two predicate offenses—robbery and felony vandalism—but felony vandalism no longer qualifies as a predicate offense. (§ 186.22, subd. (e)(1).) Accordingly, the true findings on the gang enhancements must be reversed and the matter remanded to allow the prosecution the option of retrying the enhancements and establishing all elements required by Assembly Bill 333.[13] (See, e.g., *E.H.*, at p. 480; *Delgado*, at p. 1091.)

---

[12] Assembly Bill 333 also enacted new section 1109. That section provides, inter alia, that if requested by the defense, a charged section 186.22, subdivision (b) or (d) enhancement "shall be tried in separate phases," with the question of guilt of the underlying offense to be determined first and the truth of the gang enhancement tried thereafter. (§ 1109, subd. (a).) The People's concession that Assembly Bill 333 is retroactive does not extend to newly added section 1109. (See generally *People v. Perez* (2022) 78 Cal.App.5th 192, 207 [section 1109 is not retroactive]; but see *People v. Burgos* (2022) 77 Cal.App.5th 550, 554, 561 [section 1109 is retroactive].) Neither Jacobo nor Gutierrez make any argument regarding section 1109.

[13] Because we reverse the gang enhancements and remand for their potential retrial, we need not decide whether any other new elements of section 186.22 were met.

III. There was sufficient evidence to support Gutierrez's assault with a deadly weapon conviction.

Gutierrez contends there was insufficient evidence to support his conviction for aiding and abetting Jacobo's assault on Santiago with a deadly weapon—i.e., Santiago's crutch. There is no merit to this claim.

When determining whether the evidence was sufficient to sustain a criminal conviction, " ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1104; *People v. Salazar* (2016) 63 Cal.4th 214, 242.) We presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People v. Medina* (2009) 46 Cal.4th 913, 919.) Reversal is not warranted unless it appears " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331; *People v. Penunuri* (2018) 5 Cal.5th 126, 142.) The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence. (*Salazar*, at p. 242.) We must accept logical inferences the trier of fact might have drawn from the evidence. (*Ibid.*) The federal standard of review is the same. (*People v. Westerfield* (2019) 6 Cal.5th 632, 713.)

All persons involved in the commission of a crime are principals whether they commit the act constituting the offense, or merely aid and abet in its commission. (§ 31.) A direct aider and abettor must act with knowledge of the perpetrator's

criminal purpose, with the intent to commit, encourage, or facilitate the commission of the offense, and by an act or advice to aid, promote, encourage, or instigate the commission of that crime. (*People v. Beeman* (1984) 35 Cal.3d 547, 561.) Aiders and abettors share the perpetrator's guilt and criminal liability. (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.)

As we have said, a person aids and abets a crime when the person, (1) with knowledge of the perpetrator's unlawful purpose, (2) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (3) by act or advice, aids, promotes, encourages or instigates the commission of the crime." (*Nguyen*, *supra*, 61 Cal.4th at p. 1055.) "[I]n general neither presence at the scene of a crime nor knowledge of, but failure to prevent it, is sufficient to establish aiding and abetting its commission. [Citations.] However, '[a]mong the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' " (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.)

Gutierrez argues there was no evidence he intended "to encourage or facilitate the assault of Santiago," or that "he had any knowledge Jacobo would ever swing a crutch." But this argument is plainly contradicted by the surveillance videotapes, which vividly captured (from several angles) what happened in front of the liquor store when Gutierrez and Jacobo got out of the truck. Initially, Gutierrez and Jacobo both approached Santiago. But when Jacobo began assaulting Santiago, Gutierrez turned toward Ernie—who was standing behind Santiago—and assaulted him. Gutierrez attempted to hit Ernie in the head with a handgun and kicked him, leaving Ernie on the ground. At that

point, Gutierrez turned away from Ernie and joined Jacobo in chasing Santiago down the sidewalk. The videotape clearly shows Gutierrez joining the pursuit of Santiago, running just a step or two behind Jacobo as Jacobo chases Santiago while swinging the crutch at him.

Thus, the jury could have reasonably concluded that Gutierrez encouraged and facilitated Jacobo's attack on Santiago by initially subduing Ernie so that Ernie would not be able to come to Santiago's aid, by joining Jacobo as he pursued Santiago down the sidewalk while swinging the crutch at him, and then by fighting with Joel in the street when Joel came to Santiago's aid.

There was ample evidence that Gutierrez aided and abetted Jacobo's assault on Santiago with the crutch.

IV.     Gang expert testimony was properly admitted.

Jacobo contends the trial court erred by allowing Detective Aguirre, the prosecution gang expert, to give certain testimony. We disagree.

Citing *People v. Killebrew* (2002) 103 Cal.App.4th 644 (*Killebrew*), Jacobo asserts that Detective Aguirre should not have been allowed to testify that gang members typically know whether fellow gang members are carrying firearms, and that sometimes gang members have no choice but to assault, shoot, or kill persons being disrespectful to them. Jacobo argues this testimony was *irrelevant* and constituted an improper opinion as to his subjective knowledge and intent, issues that properly should have been reserved for the jury.

In this case, the gang expert testimony was unquestionably relevant. "When offered by the prosecution, we have condemned the introduction of evidence of gang membership if only tangentially relevant, given its highly inflammatory impact."

24

(*People v. Cox* (1991) 53 Cal.3d 618, 660, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) However, "evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.]" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049; see also *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1369 ["[e]vidence of gang activity and affiliation is admissible where it is relevant to issues of motive and intent"]; *People v. Avitia* (2005) 127 Cal.App.4th 185, 192 ["Gang evidence is admissible if it is logically relevant to some material issue in the case other than character evidence, is not more prejudicial than probative, and is not cumulative."].)

Here, Detective Aguirre's testimony provided the jurors with the information they needed to understand how an apparently innocuous verbal interchange inside the liquor store could have exploded so quickly into the vicious physical assault in front of the store, followed by the shooting of Joel in the intersection. According to the time stamps on the surveillance videotapes, the entire incident—from the moment Jacobo entered the liquor store until Joel left Martha's van and was shot—took only a little more than two minutes.

Jacobo's reliance on *Killebrew* to attack Aguirre's hypothetical-based testimony is misplaced. "A gang expert may render an opinion that facts assumed to be true in a hypothetical question present a 'classic' example of gang-related activity, so

25

long as the hypothetical is rooted in facts shown by the evidence. [Citation.]" (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1551, fn. 4.) This is true even if the gang expert's opinion in effect answers an ultimate issue in the case. In *People v. Vang* (2011) 52 Cal.4th 1038, the court stated, "[t]o the extent *Killebrew* . . . purported to condemn the use of hypothetical questions, it overlooked the critical difference between an expert's expressing an opinion in response to a hypothetical question and the expert's expressing an opinion about the defendants themselves. *Killebrew* stated that the expert in that case 'simply informed the jury of his belief of the suspects' knowledge and intent on the night in question, issues properly reserved to the trier of fact.' [Citation.] But, to the extent the testimony responds to hypothetical questions, as in this case (and, it appears, in *Killebrew* itself), such testimony does no such thing. Here, the expert gave the opinion that an assault committed in the manner described in the hypothetical question would be gang related. The expert did *not* give an opinion on whether the defendants did commit an assault in that way, and thus did *not* give an opinion on how the jury should decide the case." (*Id.* at pp. 1047—1049, fns. omitted.)[14]

The crucial distinction is the difference between testifying about a particular person's mental state and testifying about the mental states of gang members in general. Here, based on his knowledge of the general habits and culture of gang members, Aguirre properly testified about gang members in general, and he

---

[14]    Jacobo also cites *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1197 to 1198, but that case was decided by the same Court of Appeal that decided *Killebrew* and used a similar analysis.

26

did not offer opinion testimony about the knowledge or intent of Jacobo and Gutierrez in this case. The trial court did not err by admitting his testimony.

V.     Claims of instructional error

Jacobo and Gutierrez raise several claims of instructional error.

A. *Instruction on deadly weapon*

For the first time in his supplemental brief filed after the 2019 remand, Jacobo asserted that the trial court erred by instructing, "A *deadly weapon other than a firearm* is any object, instrument, or weapon that is inherently deadly or dangerous or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury." (CALCRIM No. 875, italics in original.) He avers that the instruction was flawed because "a crutch is not an inherently deadly weapon as a matter of law." He argues the instruction should have stated that an object is deadly or dangerous if it was both capable of causing, *and* likely to cause, death or great bodily injury.

There are two answers to this contention, both short. First, Jacobo did not raise this issue in his original briefing in the case. Our Supreme Court has never granted review on the question and did not remand for consideration of it. Jacobo did not seek permission from this court to raise this wholly new issue in his supplemental briefing. (See Cal. Rules of Court, rule 8.200(b)(2) [after remand or transfer from Supreme Court, supplemental briefs are limited to matters arising after previous Court of Appeal decision in the cause, unless presiding justice permits briefing on other matters].) Thus, the issue is not cognizable at this juncture.

Second, Jacobo's argument is based upon a misreading of the record.  The instruction he challenges does, in fact, say exactly what he says it should:  the item must be both capable of *and* likely to cause death or great bodily injury.  (See *In re B.M.* (2018) 6 Cal.5th 528, 533 [object alleged to be a deadly weapon under § 245, subd. (a)(1) must be used in a manner capable of producing and likely to produce death or great bodily injury].)

B. *Attempted involuntary manslaughter instruction*

Jacobo and Gutierrez contend the trial court erred by not instructing the jury sua sponte on attempted involuntary manslaughter as a lesser included offense of attempted murder.[15] There is no merit to this claim.

"In a number of instances, courts have held that because an attempt requires that a defendant act with the specific intent to commit the attempted crime, 'a defendant cannot be convicted of attempting to commit a substantive crime that by definition must be committed unintentionally.'  (1 Witkin & Epstein [Cal. Criminal Law (3d ed. 2000)] Elements, § 53, p. 263, italics omitted.)  For example, the Court of Appeal in *People v. Broussard* (1977) 76 Cal.App.3d 193, 197, concluded that because the crime of involuntary manslaughter by definition involves an unintentional killing, an attempt to commit that crime 'would require that the defendant intend to perpetrate an unintentional killing—a logical impossibility,' and accordingly held that there is

---

[15]     Jacobo raised this issue in his original appeal from the judgment of conviction and, as we are reversing his attempted murder conviction, it is no longer relevant as to him.  However, because Gutierrez joined any issue that might be relevant to him, we address the issue.

28

no crime of attempted involuntary manslaughter. [Citation.]" (*People v. Toledo* (2001) 26 Cal.4th 221, 232, fn. 7.) This Division has also held that "there can be no crime of *attempted involuntary manslaughter.*" (*People v. Villanueva* (2008) 169 Cal.App.4th 41, 54, fn. 12.)

The trial court did not err by failing to instruct the jury on attempted involuntary manslaughter.

### C. *Attempted voluntary manslaughter instruction*

Gutierrez contends the trial court erred by refusing the defense request to instruct the jury on attempted voluntary manslaughter as a lesser included offense of attempted murder. We do not agree.

#### 1. Background

At the jury instruction conference, the defense attorneys asked for attempted voluntary manslaughter instructions based on theories of imperfect self-defense and heat of passion/sudden quarrel. Counsel argued that Martha's testimony[16] demonstrated there had been two separate fights: an initial altercation between Jacobo and Santiago that ended when Santiago ran back to the van; and then, a second altercation that occurred when Joel left the van and started fighting with Gutierrez. Defense counsel argued that, according to this evidence, Gutierrez had merely been defending himself when he shot Joel.

---

[16] Martha testified at one point that Santiago "ran inside the van, and that's when my husband Joel, he came out fighting . . . ." Nevertheless, the implication that Joel did not leave the van until after Santiago got back in is refuted by the surveillance videotapes.

29

The prosecutor disagreed, arguing defendants had been the aggressors throughout the entire incident and that there was no evidence of sufficient provocation by the victims. The prosecutor also argued there was no evidence Gutierrez ever believed he was in imminent danger.

The trial court agreed with the prosecutor and refused to give the requested instructions. The court concluded there was no evidence of sufficient provocation, and no evidence that Gutierrez actually believed he was in danger: "There was zero evidence that the defendant believed that he was in imminent danger of being killed or suffering great bodily injury. There is zero evidence that the defendant believed that the use of deadly force was necessary to defend." The court also stated, "This is not a heat of passion case."

### 2. Legal principles

"When there is substantial evidence that an element of the charged offense is missing, but that the accused is guilty of a lesser included offense, the court must instruct upon the lesser included offense, and must allow the jury to return the lesser conviction, even if not requested to do so. [Citations.]" (*People v. Webster* (1991) 54 Cal.3d 411, 443.) In this context, "substantial evidence" is evidence from which reasonable jurors could conclude the lesser offense, but not the greater, had been committed. (*People v. Breverman* (1998) 19 Cal.4th 142, 162.)

"An intentional, unlawful homicide is 'upon a sudden quarrel or heat of passion' (§ 192(a)), and is thus voluntary manslaughter [citation], if the killer's reason was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an ' "ordinary [person] of average disposition . . . to act rashly or without due deliberation and

30

reflection, and from this passion rather than from judgment." ' [Citations.] ' "[N]o specific type of provocation [is] required . . . ." ' [Citation.] Moreover, the passion aroused need not be anger or rage, but can be any ' " '[v]iolent, intense, high-wrought or enthusiastic emotion' " ' [citation] other than revenge [citation]." (*People v. Breverman*, *supra*, 19 Cal.4th at p. 163.)

"Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually*, but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter." (*In re Christian S.* (1994) 7 Cal.4th 768, 771.) "[T]he doctrine is narrow. It requires without exception that the defendant must have had an *actual* belief in the need for self-defense. . . . ' "[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with*." ' . . . [¶] . . . [W]hether the defendant actually held the required belief is to be determined by the trier of fact based on all the relevant facts. It is not required to accept the defendant's bare assertion of such a fear. . . . Finally, we reiterate that, just as with perfect self-defense or any defense, '[a] trial court need give a requested instruction concerning a defense *only if there is substantial evidence to support the defense*.' " (*Id*. at p. 783.)

### 3. Discussion

The trial court correctly decided that Gutierrez was not entitled to either an imperfect self-defense attempted voluntary manslaughter instruction, or a heat-of-passion attempted

31

voluntary manslaughter instruction, with respect to the shooting of Joel.

(a) *Imperfect self-defense instruction properly refused.*

"It is well established that the ordinary self-defense doctrine—applicable when a defendant *reasonably* believes that his safety is endangered—may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified. [Citation.] It follows, a fortiori, that the imperfect self-defense doctrine cannot be invoked in such circumstances." (*In re Christian S.*, *supra*, 7 Cal.4th at p. 773, fn. 1.)

The evidence demonstrated that it was the defendants who initiated the violent melee—when Jacobo punched Santiago while Gutierrez attacked Ernie—which directly led, about 15 seconds later, to Joel's shooting after he left the van to protect Santiago from defendants' attack. The defendants' concerted action reasonably implies they had a common purpose, which Gutierrez manifested when he joined Jacobo in chasing Santiago after having knocked Ernie to the ground. Thus, as to both defendants, Joel's bystander intervention was a reasonably expected occurrence and Gutierrez cannot invoke the imperfect self-defense doctrine. (See *People v. Seaton* (2001) 26 Cal.4th 598, 664 [no evidence supported imperfect self-defense because "defendant's testimony showed him to be the initial aggressor and the victim's response legally justified"]; *People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1179–1180 [imperfect self-defense

inapplicable if defendant "creates circumstances where the victim is *legally* justified in resorting to self-defense"].)

A separate reason for refusing to instruct the jury on imperfect self-defense was the absence of any evidence showing that Gutierrez "*actually . . .* believed he was in imminent danger of death or great bodily injury" when he shot Joel. (*In re Christian S., supra,* 7 Cal.4th at p. 771; see *People v. Minifie* (1996) 13 Cal.4th 1055, 1065 [defendant claiming self-defense must " ' "prove his own frame of mind" ' "].) There was no evidence that Gutierrez shot Joel because he was afraid of him.

In sum, we conclude the trial court properly refused to instruct the jury on imperfect self-defense attempted voluntary manslaughter because there was no substantial evidence to support this theory. (See *In re Christian S., supra,* 7 Cal.4th at p. 783.)

(b)     *Heat-of-passion instruction properly refused*

We find the trial court properly refused to instruct on heat-of-passion attempted voluntary manslaughter because, even assuming arguendo that Gutierrez's reason had been obscured by strong passion, there was no evidence this passion had been aroused by a legally sufficient cause. (See *People v. Pride* (1992) 3 Cal.4th 195, 250 [some evidence may, as matter of law, be insufficient to arouse homicidal rage or passion in a reasonable person]; *People v. Wickersham* (1982) 32 Cal.3d 307, 326 [" ' "no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable

33

man" ' "], disapproved on other grounds in *People v. Barton* (1995) 12 Cal.4th 186, 201.)

It is a general rule that adequate provocation cannot be based on mere hard looks and taunting words. (See *People v. Gutierrez* (2009) 45 Cal.4th 789, 826 ["voluntary manslaughter instruction is not warranted where the act that allegedly provoked the killing was no more than taunting words, a technical battery, or slight touching"]; *People v. Manriquez* (2005) 37 Cal.4th 547, 586 [calling defendant a " 'mother fucker,' " and daring him to use his weapon if he had one, "plainly were insufficient to cause an average person to become so inflamed as to lose reason and judgment"]; *People v. Lucas* (1997) 55 Cal.App.4th 721, 740 [receiving hard looks or so-called "mad-dogging" does not constitute reasonable provocation to shoot someone].) This rule does not change just because Gutierrez belonged to a gang. (Cf. *People v. Humphrey* (1996) 13 Cal.4th 1073, 1087 [indicating disapproval of a reasonable gang member standard: "Contrary to the Attorney General's argument, we are not changing the standard from objective to subjective, or replacing the reasonable 'person' standard with a reasonable 'battered woman' standard. Our decision would not, in another context, compel adoption of a ' "reasonable gang member" standard.' "].) Gutierrez's gang-based reasons for assaulting the victims in this case cannot provide the reasonable provocation needed to justify a heat-of-passion defense.

Furthermore, it is well-established that predictable conduct by a resisting victim does not constitute sufficient provocation to warrant a heat-of-passion defense. (See, e.g., *People v. Rich* (1988) 45 Cal.3d 1036, 1112 [resistance by rape victim]; *People v. Jackson* (1980) 28 Cal.3d 264, 306 ["defendant may have become

enraged and brutally attacked and killed one of his elderly victims because she awakened during the burglary and began to scream"], disapproved on another ground in *People v. Cromer* (2001) 24 Cal.4th 889, 901, fn. 3].)  We cannot see why this rule would not apply to Gutierrez's act of shooting at Joel, whose intervention to rescue his son was just as predictable as the actions of a classic "resisting victim."

The trial court properly refused to instruct the jury on heat-of-passion attempted voluntary manslaughter.

VI.    The trial court properly upheld the prosecution's assertion of the evidentiary privilege.

Jacobo and Gutierrez ask us to determine whether the trial court properly upheld the prosecution's assertion of an evidentiary privilege relating to Detective Aguirre's gang expert testimony.  We find that the trial court properly upheld the privilege.

After Aguirre testified that gang members typically know which other gang members have guns in their possession, defense counsel asked for the names of informants who had given Aguirre this information.  Aguirre refused to answer, asserting a governmental privilege, pursuant to Evidence Code section 1041.  Aguirre also asserted a governmental privilege pursuant to Evidence Code section 1040 when asked about his utilization of the Cal Gangs computer database during his investigation of this case.  After two in camera hearings, the trial court ruled that Detective Aguirre had properly asserted privilege as to both inquiries.  The court concluded the information was not material because there was no reasonable probability it would lead to any exculpatory evidence, and that there was a legitimate concern for the informant's safety.

The parties assert that, on appeal, this court should resolve the issue by reviewing the transcripts of the in camera hearings. We agree that this is the correct procedure.

Detective Aguirre asserted two different, but related, evidentiary privileges:  the official information privilege (Evid. Code, § 1040) and the confidential informant privilege (Evid. Code, § 1041).  "Under [Evidence Code] section 1040, a public entity has a privilege to refuse to disclose official information and to prevent another from disclosing it if disclosure of the information is against the public interest because there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure.  [Citation.]" (*Torres v. Superior Court* (2000) 80 Cal.App.4th 867, 872.)  "The common law privilege for an informant's identity has been codified in Evidence Code section 1041.  [Citation.]  Section 1041 provides, in relevant part:  '[A] public entity has a privilege to refuse to disclose the identity of a person who has furnished information [in confidence to a law enforcement officer] . . . purporting to disclose a violation of a law of the United States or of this state or of a public entity in this state . . . if . . . (2) Disclosure of the identity of the informer is against the public interest because there is a necessity for preserving the confidentiality of his identity that outweighs the necessity for disclosure in the interest of justice . . . .' " (*People v. Navarro* (2006) 138 Cal.App.4th 146, 164, fn. omitted.)

"[T]he [trial] court has the authority to hold an in camera hearing on a proper showing that the hearing is necessary to determine the claim of privilege.  [¶]  [Evidence Code] [s]ection 915, subdivision (b), provides:  'When a court is ruling on a claim of privilege under Article 9 (commencing with Section 1040) of

36

Chapter 4 (official information and identity of informer) . . . and is unable to do so without requiring disclosure of the information claimed to be privileged, the court may require the person from whom disclosure is sought or the person authorized to claim the privilege, or both, to disclose the information in chambers out of the presence and hearing of all persons except the person authorized to claim the privilege and such other persons as the person authorized to claim the privilege is willing to have present.  If the judge determines that the information is privileged, neither he nor any other person may ever disclose, without the consent of a person authorized to permit disclosure, what was disclosed in the course of the proceedings in chambers.' " (*Torres v. Superior Court, supra,* 80 Cal.App.4th at p. 873.)

We have reviewed the transcripts of the in camera hearings.  Based on that review, we conclude the trial court properly determined that the governmental privilege was properly asserted.

## DISPOSITION[17]

Count 1 for attempted murder as to Jacobo and all gang enhancements as to both Jacobo and Gutierrez are reversed, and their sentences are vacated. The matter is remanded to provide the People an opportunity to retry count 1 as to Jacobo under the law as amended by Senate Bills 1437 and 775, and to retry the section 186.22, subdivision (b), gang enhancements as to Jacobo and Gutierrez under the law as amended by Assembly Bill 333. At the conclusion of any retrial, or if the People elect not to have a retrial, the trial court is directed to conduct a full resentencing of Jacobo and Gutierrez. In all other respects, the judgments are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

LAVIN, J.

EGERTON, J.

---

[17] Because Jacobo and Gutierrez will be resentenced, we need not address any issues they raised regarding Senate Bill No. 620 and restitution fines.